Filed 2/15/22  In re P.L. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re P.L. et al., Persons Coming Under the Juvenile Court Law.

RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,

    Plaintiff and Respondent,

    v.

S.A.,

    Defendant and Appellant.

E076969

(Super.Ct.No. SWJ2000579)

OPINION

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge. Reversed and remanded.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel and James E. Brown, Anna M. Marchand and Julie Koons Jarvi, Deputy County Counsel for Plaintiff and Respondent.

Mother filed an appeal following a jurisdictional/dispositional hearing[1] at which her three children, P.L. (age 4 at time of petition), E. L. (age 11 months), and G. A. (age 2), were placed with their non-custodial presumed father and the dependency was terminated, pursuant to Welfare and Institutions Code, section 361.2.[2] The children came to the attention of the Riverside County Department of Public Social Services (Department) due to mother's failure to supervise the children, neglect of their medical, dental, and other needs, as well as her history of unresolved mental illness for which she did not take medication. The noncustodial presumed father A.L.'s home was approved for placement for an extended visit, and at the combined jurisdiction/disposition hearing, the court awarded him physical custody of the children and dismissed the dependency. Mother appeals.

---

[1] We treat this appeal as an appeal from the adjudication/jurisdiction and disposition hearing, applying a liberal construction. Mother's notice of appeal does not identify the particular judgment or order from which the appeal is taken (Cal. Rules of Court, rule 8.405(a)(3)), incorrectly describing it in item 7 of the Judicial Council form as being pursuant to Welfare and Institutions Code section 305.5, an order transferring the matter to a tribal court. However, neither parent indicated they had Indian heritage, resulting in a finding that the Indian Child Welfare Act (ICWA) did not apply. No amended notice of appeal has been filed, but both parties assume the appeal is taken from the dispositional judgment. "[N]otices of appeal are to be liberally construed so as to protect the right of appeal if it is reasonably clear what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced.' [Citation.]" (*In re Joshua S.* (2007) 41 Cal.4th 261, 272, quoting *Luz v. Lopes* (1960) 55 Cal.2d 54, 59.)

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

On appeal, mother argues the trial court erred in denying her oral motion to continue the disposition hearing pending the results of Live Scans of the other adults in father's home, and that the dispositional order awarding custody to father was in excess of the juvenile court's jurisdiction where it did not formally remove custody from mother. We affirm.

**BACKGROUND**

P.L., then age 4, E.L. then age 10 months, and G.A., age 2, came to the attention of the Department on October 16, 2020, when the maternal grandmother, with whom G.A. had been living, asked mother to pick up the child. Mother declined because she was then living out of state in a toxic relationship and had outstanding warrants. Mother and maternal grandmother had a mutual agreement because G.A. was the product of a rape of mother by a man unknown to mother except by his first name, so G.A. had lived with the maternal grandmother. A few days later after the first call, maternal grandmother made a second request for mother to pick up G.A., and this time, mother picked him up. During the time maternal grandmother had care of G.A., she had neglected his medical and dental needs, and had thrown a phone at him hitting him in the mouth, hurting his lip, broken some of his teeth, and bent his finger before requesting that mother take him.

After receiving the referral, a social worker made an unannounced visit. Mother was uncooperative insisting her children were fine, but the circumstances apparent to the social worker were concerning: G.A. had rotten teeth, was dirty and wearing a wet

3

diaper; P.L. was also dirty, and, when the social worker arrived, the children were playing in a driveway on a busy street, unsupervised.

The living arrangements in the household were not ideal. P.L. slept in the bedroom with mother and her boyfriend, M.D., with the door locked, while E.L. slept in a playpen in the living room, where J.A., mother's 16-year-old developmentally delayed, malnourished brother (the maternal uncle, who had also been abused and neglected by the maternal grandmother) supervised him. In the house, there was alcohol that was accessible to the children, but no formula for E.L., because mother had decided he should eat a regular diet, and the home was unkempt. Mother allowed her brother to care for E.L., and, in the social worker's presence, M.D. attempted to feed E.L. a bottle of V-8 juice, while the child lay on his back causing the child to choke. The social worker showed the boyfriend how to properly feed the baby.

Mother made inconsistent statements regarding the progeny of G.A., first stating he was the product of rape, but also stating that A.L., the father of the other children, must be his father. Mother also described what an unfit custodian the maternal grandmother was, but when asked why she left G.A. in the care of such an unfit person, mother explained she gave G.A. to the maternal grandmother to raise to give her a second chance to do a better job raising him than the grandmother did with mother and her brother. Due to mother's irrational decisions, the social worker offered mother informal services, but mother declined, protesting that she was a good parent. Child welfare

4

history supported the social worker's concern where mother had a lengthy history of referrals for neglect, severe neglect and abuse as a minor.

Nevertheless, the decision was made to file an out-of-custody petition, pursuant to section 300, subdivision (b)(1), based on mother's failure to supervise the children or provide adequate food, her unresolved mental health issues for which she was not taking medication, her lack of parenting skills in allowing the children to play unsupervised in a driveway near a busy street, and that father, who was not a member of the household, failed to protect.

The decision to remove the children was based on subsequent events leading to a referral on November 19, 2020. The referral indicated mother was supposed to drop off P.L. and E.L. with their father in Reno, Nevada, but instead, she took G.A. to Reno, and left him alone in the street at 3:00 a.m., as mother and her boyfriend drove off. The maternal grandmother reported that mother had taken G.A. to the dentist, but abruptly took him out of the dentist's office, with bloody mouth and bruises, drove him to Reno without a car seat, and left the child, barefooted, in the street, without clothes or medication. Mother and father had an argument when she arrived, with mother reporting that father punched her in the face, although no marks were visible when the social worker interviewed her later that day. On the way back to California, mother had been in a car accident. Maternal grandmother reported that mother left the baby, E.L., alone with his minor uncle, so she contacted law enforcement to conduct a welfare check.

Subsequent contact with father revealed that P.L. was also in the car when mother arrived in Reno.

When asked why she took G.A. to stay with father A.L., when mother had claimed he was not G.A.'s father, mother now contended A.L. must be G.A.'s father. Regarding the wisdom of leaving E.L. alone with J.A. while she went to Reno, mother denied leaving them at the residence, asserting they were in the car when she left G.A. with father A.L., and that after she returned to California, she had dropped J.A. and E.L. off at their residence and left to buy groceries. However, J.A. earlier had informed the social worker that mother was not home because she was visiting a friend in the hospital. And father later confirmed that E.L. was not in the car when mother left G.A. in the street. This meant mother had left E.L. with his developmentally delayed teenaged uncle, despite her denial.

The social worker's investigation led to contact with the dentist's office where she learned the dentist had recommended capping the child's teeth. Mother insisted he pull the teeth because she "was getting rid of the child and putting him up for adoption." This, and her "disconnect" with G.A., left an impression on the personnel at the dental office. The dental office also noted that mother appeared to lack common sense respecting supervision or nurturing of children. Meanwhile, mother complained about being harassed by the social services agency, despite the fact she had gotten rid of G.A.

On November 30, 2020, a welfare check was made on G.A. while in father's care in Reno, finding him to be in good health. Father's home was described as appropriate,

6

and law enforcement indicated there were no concerns about it. Father A.L., had not submitted to DNA testing, but he believed G.A. to be his own child due to a resemblance.

On December 9, 2020, another social worker observed mother in a heated argument with two women, and, while so distracted, P.L. walked past her and out the front door, requiring the social worker to intervene. That same day, mother left a voice mail message for the social worker ranting against the social services agency. Due to concerns about mother's ability to supervise and the parents' volatile relationship. the department decided to place the children in protective custody.

On December 15, 2020, the department filed a first amended petition, realleging the previous jurisdictional facts, but adding G.A. and an allegation that the parents engage in domestic violence in the children's presence. In the detention report, DPSS recommended detaining all three children, for whom a protective custody warrant had been issued on December 10, 2020.[3] When informed of the recommendation by the Department, mother launched a verbal attack, yelling obscenities in front of the children and telling the social worker she hoped the worker either choked on V-8 juice or was killed in an accident. P.L. and E.L. were placed in a foster home, and, on December 13, 2020, G.A. was placed in protective custody when father brought him back to Riverside County and surrendered G.A. to the department for placement.

On December 16, 2020, the court conducted the detention hearing. A.L. was declared the presumed father of P.L. and E.L., but the court reserved ruling as to G.A.

---

[3] The protective custody warrant is not in the record.

The court found a prima facie showing had been made that all three children came within section 300 of the Welfare and Institutions Code, and that the risk of substantial danger to the children required their removal from the parents' care. The court authorized paternity testing of father respecting paternity of G.A., and also authorized an extended visit for father with the children pending the next hearing if his home could be assessed. Although the father was not declared a presumed father of G.A. at this time, the court found he was a non-relative extended family member (NREFM) with respect to G.A. pending the results of the paternity testing. At the hearing, father executed a Statement of Parentage (JV-505) as to all three children.

The report for the jurisdiction/disposition hearing was filed on January 5, 2021. It included prior child welfare contacts involving the parents, comprising several unsubstantiated reports of neglect, medical neglect and domestic violence resulting in closed investigations.[4] The report also noted that father had submitted to paternity testing. Regarding the allegations of the petition that father failed to protect or provide for the children, father indicated he did support the children when they lived in Reno until mother left. However, after mother left to return to California, she "blocked" him from contacting her. He tried to contact her through social media sites and asked friends to text her. He finally heard from her after four months, when she texted him about dropping off G.A. Regarding the allegation of domestic violence, father admitted to verbal arguments, but nothing physical. The department recommended that the court find

_____

[4] In this report, some of the prior contacts in Washoe County, Nevada, refer to a child named Is., age 4, who is not a party to the instant proceedings.

8

the allegations of the petition true, adjudge the children as dependents, make findings pursuant to section 361, and remove custody of the children from the parents with the provision of reunification services.

On January 8, 2021, the matter was called for the jurisdiction hearing, at which time the matter was set as a contested hearing. The court directed the Department to investigate whether an extended visit for father and G.A. was appropriate and authorized an extended visit for father as to all children as soon as the department approved the status of all adults residing in father's home.[5]

On February 22, 2021, the Department submitted an addendum report with the same recommendations, but with an added request that a psychological evaluation be ordered for mother and a request to authorize father's home for placement of the children with him in Nevada. By way of additional information, the Department reported that mother had declined referrals for services, although she did indicate she was enrolled in counseling. Later she signed the case plan and agreed to participate in all services except anger management, because she did not need it. She also signed up for parenting classes and anger management classes. At the Child and Family Team meeting held on January 28, 2021, the Department indicated it intended to follow the "path of presumed father," and would continue to assess for extended visits for father. It was also agreed that mother would not excessively call the caregivers outside the scheduled time.

---

[5] At the time of the proceedings, father was living with the paternal grandmother.

9

The report also included information about visits and efforts to complete an assessment of father's residence in Reno, Nevada for an extended visit. A courtesy home visit had been conducted on father's home by Washoe County social services, and found the home is appropriate with no safety concerns. Additionally, the paternal grandmother, her boyfriend, and an adult male, who lived in the household, denied any criminal history.

During the interim, mother's visits with the children reflected continued poor judgment: she was observed putting G.A. in time out without giving him permission to get up from his isolation chair, leaving him there for a longer period than was appropriate for his age. She also spanked P.L during the visit. When the incidents were discussed with mother, she informed the social worker that she had learned she had a right to physically discipline her children from the parenting education classes.

The father had consistent video calls with the children and there were no concerns, although he reported that mother excessively called the paternal grandmother and himself.

On February 25, 2020, the matter was scheduled for the jurisdiction/disposition hearing. However, the Department made a motion to file a second amended petition. The amendment added an allegation pursuant to section 300, subdivision (g), that the whereabouts and identity of the father of G.A. were unknown and that he failed to provide for G.A. The Department requested a continuance in order to obtained out-of-state criminal records information respecting father's "roommates" and asked that the

court leave in place the authorization for extended visits for father with all three children. Father proffered stipulated testimony going to the issue of his being the presumed father of G. A., which the court accepted. According to his testimony, between January and June of 2020, G.A. went back and forth between father's home and mother's home, staying four weeks to a month at a time. He holds G.A. out as his son and considers him part of his family. He has provided toys, clothes, diapers, wipes, and everything a child needs when G.A. has been in his care, and he is willing and able to have G.A. placed in his care, along with his siblings.

The court found father was the presumed father of G.A. and signed a formal order of parentage. The matter was continued for background checks of father's roommates. Mother argued against father being declared presumed father of G.A. and objected to the extended visits for the children with father.

On March 24, 2021, the Department submitted another addendum report, again recommending true findings on the petition, but this time it recommended placement with father, an award of physical custody to him, and termination of the dependency upon the filing of the custody orders.

The recommendations were based on the following additional information: Father's in person visits with the children had gone well, although mother had behaved aggressively toward him by blocking him in the parking lot of a Walmart store. On February 25, 2021, the department was informed that the Investigative Criminal Report team had processed documents to initiate background checks for paternal grandmother,

her fiancé and the adult roommate. No criminal contacts were found in California, and no FBI numbers were located, required to run an FBI report. Because all three members of father's household resided out of state, the Department requested that they be referred for Live Scan.

On March 11, 2021, the report indicated that Nevada was able to do the Live Scans, but the results would take a long time. The social worker informed father that until Live Scan clearances of the paternal grandmother and the other occupants of the household were received, the children could not be left unsupervised with the paternal grandmother, her fiancé and the other adult male. Father agreed to abide by this directive.

On March 18, 2021, mother's therapist informed the social worker that mother could use additional in-home help with the children, and that mother had been verbally combative during sessions, needing to be redirected.

On March 20, 2021, father picked up the children (with a vehicle adequately furnished with car seats) to begin his extended visit. When the social worker contacted the father on March 22, 2021, the children were doing well. The Department recommended that the children remain in father's care pending family law orders.

On March 29, 2021, the court completed the jurisdiction/disposition hearing. Mother requested custody be awarded solely to her, "or at least wait for continuance [*sic*] to wait for Live Scan results." The court did not rule on the request, but after admitting the reports into evidence and considering them, the court struck the allegations regarding

father's failure to protect the children, as well as the allegation under section 300, subdivision (g) regarding G.A.'s father, in light of the court's determination that father A.L. was the presumed father of G.A.[6]

The court then found that the noncustodial father was not residing with the children when the events or conditions arose that brought the children within the provisions of section 300, he desires custody, and that placement with the noncustodial father will not be detrimental to the children. The court therefore adopted the findings recommended in the report, awarded custody of the children to the noncustodial father, found that services were not needed, and granted mother reasonable visitation, to be supervised, over mother's objection to supervision.

On April 29, 2021, mother appealed.

## DISCUSSION

a.  *Failing to Obtain a Ruling on the Continuance Request Forfeits Any Claim of Error.*

Mother argues the court erred in denying her oral request for a continuance of the disposition hearing, made at the hearing, was reversible error. There are a few problems with mother's argument: (i) the trial court did not actually deny the request to continue; (ii) mother did not file a written motion as required by statute; and (iii) to the extent the

---

[6] After making these findings, the court also found that the child E.L was a person described under section 300, subdivision (g), but this appears to be inadvertent, because at no time had the petition alleged he was such a person.

13

court may be deemed to have denied the request, there was no abuse of discretion. We therefore disagree.

A major problem with mother's argument is that there is no indication the court ever ruled on her request to continue. She made her request almost as an afterthought, while arguing that the court should not follow the Department's recommendation as to the disposition: "So mother is asking that the Court did not - - not to follow the recommendation, *at least wait for continuance* [*sic*] *to wait for LiveScan results.*" There was no ruling on mother's suggestion for a continuance and mother did not press the court for a ruling.

"'[W]here the court, through inadvertence or neglect, neither rules nor reserves its ruling . . . the party who objected must make some effort to have the court actually rule. If the point is not pressed and is forgotten, [he] may be deemed to have waived or abandoned it, just as if he had failed to make the objection in the first place.' [Citations.]" (*People v. Braxton* (2004) 34 Cal.4th 798, 813-814.) "'In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them.'" (*Sommer v. Martin* (1921) 55 Cal.App. 603, 610; accord, *In re Seaton* (2004) 34 Cal.4th 193, 198.)

Because mother failed to pursue and obtain a ruling on her request, she may be barred from claiming error on appeal. (*People v. Valdez* (2012) 55 Cal.4th 82, 122, citing

14

*People v. Ramirez* (2006) 39 Cal.4th 398, 450 "[defendant forfeited issue by failing, despite court's invitation to resolve it at a later hearing, to press for a ruling]".) But where significant issues are at stake, we have discretion to reach the merits to forestall a claim of ineffective assistance of counsel. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1250.)

However, there is another procedural problem with mother's argument: She failed to file a written motion within two days of the hearing as required by section 352, despite ample opportunity to do so. The jurisdictional hearing was originally scheduled to commence on February 25, 2021, after being continued from January 8, 2021, where it was set as a contested hearing. At that time, counsel for father reported that the DNA tests revealed that father was not the biological parent of G.A., but father wished to pursue presumed father status as to G.A., as well as placement of G.A. with father. Mother joined father's request to set the hearing for a contest with father. Minors' counsel was in favor of the extended visit but requested that ruling on parentage be reserved to give the Department more time to reach the alleged biological father. At the parties' request, the matter was set for a contested hearing on February 25, 2021.

Before the next hearing, the Department submitted its addendum report recommending that the prior visitation order remain in effect and requesting authorization for an assessment of father's home for placement. When the February 25th hearing was called, the Department filed a second amended petition and requested a further continuance for 30 days. The Department requested the court to order out-of-state

criminal histories for father's "roommates" and requested that the court leave in place the authorization for the extended visit for the children with father. On the issue of paternity of G.A., father's stipulated testimony was proffered and accepted, to support his request for presumed father status as to G.A.

Mother did not object to father's stipulated testimony but proffered her own stipulated testimony in opposition to father's request for presumed father status. The Department joined father's request for presumed father status. The court made a finding that father was G.A.'s presumed father within the meaning of Family Code section 7611, subdivision (d), and continued the hearing.

On March 9, 2021, mother was served with formal notice of the continued hearing. On March 24, 2021, the Department submitted another Addendum Report, again recommending true findings on the amended petition and removal of custody but changing its recommendation to add placement of the children with noncustodial father and termination of the dependency upon the filing of custody orders. The extended visit with father had been authorized on March 18, 2021, and father picked up the children on March 20, 2021.

By the time of the continued contested hearing, mother was aware of the recommendations, the current status of the children on an extended visit with the father, and the outstanding Live Scans. The various addenda to the jurisdiction/disposition report consistently demonstrated the Department's recommendation and efforts to resolve the dependency by placing the children with father. Thus, there was no reason for mother

16

to wait until the jurisdiction hearing was called for hearing to orally request a further continuance.

Section 352 governs continuances of hearings in dependency matters. Subdivision (a)(3) of section 352 provides: "In order to obtain a motion for a continuance of the hearing, written notice shall be filed at least two court days prior to the date set for hearing, together with affidavits or declarations detailing specific facts showing that a continuance is necessary, unless the court for good cause entertains an oral motion for continuance." (§ 352, subd. (a)(3); see also, Cal.Rules of Ct., rule 5.550(a)(4).)

The juvenile court may continue a dependency hearing at a parent's request for good cause shown. (§ 352, subd. (a).) "Courts have interpreted this policy to be an express discouragement of continuances." (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 585, citing *In re Karla C.* (2003) 113 Cal.App.4th 166, 179.) "The court's denial of a request for a continuance will not be overturned on appeal absent an abuse of discretion." (*Karla C., supra,* at p. 180.)

The requirement of a written motion to continue allows both the parties and the court to evaluate the showing of good cause required to justify a continuance. For this reason, an oral motion must be accompanied by a showing of good cause. (§ 352, subd. (a)(3).) Here, there was no demonstration of good cause, considering mother had been aware of the recommendation for two months and the Live Scan results pertained to the other occupants of father's abode, not father. Her sole motive was to delay the award of custody to father, which was not in the children's best interest.

17

Good cause could not be shown here. The lack of clearances for other members of father's household did not affect the approval of father's home for placement. It simply meant that until Live Scan clearances were received as to the paternal grandmother, and her fiancé (the other adult occupant had moved out of the home prior to the hearing) father could not leave the children unsupervised with them. The recommendation did not condition placement of the children with father on the clearances, although in many cases this is done where there may be reason to fear for the safety of the children in the home with individuals whose backgrounds are unknown.

Here, the courtesy assessment of the home by the Washoe County social services revealed no safety concerns, and an independent welfare check on G.A. in the early stages of the dependency bore similar results. Because the Live Scan clearances were not a precondition to placement with father, the unavailability of the results at the time of the hearing was not good cause to continue.

Mother's failure to put her request in writing with notice to all parties (particularly to father who traveled from Reno, Nevada for each hearing), and her lack of reasons for failing to make a written application, did not comply with section 352 or California Rules of Court Rule 5.550, so the court would have been justified in denying the request on that basis.

Nevertheless, considering the merits, there was no abuse of discretion even if the trial court's failure to rule may be construed as a denial of the motion to continue. Continuances in juvenile proceedings are disfavored. (See *In re Axsana S.* (2000) 78

Cal.App.4th 262, 272, disapproved on another ground in *In re Jesusa V.* (2004) 32 Cal.4th 588, 624, fn. 12.)  When considering a request for a continuance, the juvenile court must give substantial weight to the child's need for prompt resolution, the need to provide the child with a stable environment and the damage to the child resulting from prolonged temporary placement.  (§ 352, subd. (a).)

Further, "[c]ontinuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance."  (§ 352, subd. (a)(2).)  The standard of review on appeal of a denial of a continuance is abuse of discretion.  (*In re Karla C.*, *supra*, 113 Cal.App.4th at p. 180.)

There was no error here.  The jurisdiction/disposition hearing had been continued for several months following the detention based on the filing of the amended petition in December 2020.  Mother was aware of the Department's recommendations long before the contested hearing.  Her reasons for the request related to the desire to wait for the Live Scan clearances, but the social worker had previously informed the court and the parties that those results take a long time and no projected date of completion had been ventured.  Thus, mother's request was tantamount to an indefinite continuance, contrary to the children's need for prompt resolution.

Such a continuance was not in the best interests of the children.  Denial of the continuance, if a denial there was, was proper.

b.      *The Court's Disposition Order Was Neither Void Nor Voidable, But Remand is Required for Findings.*

Mother also claims that the disposition judgment must be reversed because the court lacked authority to place the children with father without making the requisite findings pursuant to section 361, subdivision (c), and removing custody of the children before placing them with father, rendering the order void or voidable. We disagree that the judgment was void or voidable, but the lack of findings under either section 361.2 or 361, subdivision (c), requires remand.

*(i).      Background*

At the conclusion of the disposition hearing, the court judge was interrupted by mother while reciting the findings in the record, and certain findings were not expressly made on the record. The court first struck the allegation that father failed to protect and that G.A.'s father was unknown and failed to provide for the minor, after the court had previously found that father was a presumed father of all three minors. At this point, father was a nonoffending father.

The court then determined it would follow the recommendations of the Department, at which point mother raised her hand. Mother's counsel informed the court that mother "understands that the Court is going to grant sole physical custody, and she will of course respect that order. But she is just imploring father to work with her a little bit better on working out visitation." The court responded by informing mother that it was "going to order reasonable visitation to the children. And it's to be supervised by an

20

agreed third party." The court informed the parties that supervision could be by a person mutually agreeable by the parents, or, that if that was not possible, mother would bear the cost of a professional supervisor.

Mother then objected to that proposal, but the court did not modify its indicated ruling. Then the court took judicial notice of the prior orders and judgments, found the county of residence was Riverside, and concluded the children's names and dates of birth appear on the petition. It found ICWA does not apply, found by a preponderance of the evidence the allegations b-1, b-2, b-3 and b-5 were true, that children are persons described under section 300, subdivision (b)(1) of the code, that father was not residing with the children at the time of the events or conditions that arose that brought the children within section 300, but that he does desire custody of the children and placement with the noncustodial father would not be detrimental.

Finally, after clarifying some other matters concerning visitation, the court ordered that the dependency of the children be terminated upon filing juvenile court custody orders granting father sole physical custody and joint legal custody with mother. The court adopted all other findings and recommendations contained in the report and made them orders of the court.

### (ii) General Principles

Once the juvenile court has assumed jurisdiction, it must hold a disposition hearing to determine, among other things, an appropriate placement for the child. (§ 360.) The court generally has three choices. First, if the court determines the child

21

would not be at substantial risk of physical or emotional harm if left in the custody of the offending parent or parents, the court may leave the child in parental custody and "order family maintenance services to ameliorate the conditions that made the child subject to the court's jurisdiction." (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 302; see § 362, subd. (a).)

Second, if the court determines the child would be at substantial risk of physical or emotional harm if left in parental custody, but that there is a noncustodial parent who is willing to assume custody, section 361.2 requires the court to "determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child." (§ 361.2, subd. (a).) If such a parent exists (referred to as the "noncustodial parent"), the court is then required to place the child with that parent unless it finds that doing so would be detrimental to the physical or emotional well-being of the child. (*In re Maya L.* (2014) 232 Cal.App.4th 81, 97-98.)

If the court places the child with a noncustodial parent under section 361.2, subdivision (a), it has the option to either terminate jurisdiction with a custody order in favor of the noncustodial parent or retain jurisdiction and order services to either or both parents. The first option is set forth in section 361.2, subdivision (b)(1), which states: "[If the court places the child with a noncustodial parent, it may o]rder that the parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the . . . parent [from whom the child was removed]. The court shall then

22

terminate its jurisdiction over the child. The custody order shall continue unless modified by a subsequent order of the superior court. The order of the juvenile court shall be filed in any domestic relation proceeding between the parents." (See, *In re Maya L., supra,* 232 Cal.App.4th at pp. 97-98.)

Pursuant to section 361.2, when a noncustodial parent requests placement, "the court 'shall place' the child with the parent unless 'it finds that placement with that parent would be detrimental to the minor.' [Citation.]" (*In re Marquis D*. (1995) 38 Cal.App.4th 1813, 1820-1821.) In other words, "[i]f there is no showing of detriment, the court must order the Agency to temporarily place the child with the nonoffending noncustodial parent. The court then decides whether there is a need for ongoing supervision. If there is no such need, the court terminates jurisdiction and grants that parent sole legal and physical custody." (*In re Austin P*. (2004) 118 Cal.App.4th 1124, 1135).

The language of the statute does not expressly require a removal of custody with findings pursuant to section 361, subdivision (c), as a prerequisite to an award of custody to a noncustodial parent, although it does require consideration of such placement *when* it removes custody from a parent. Decisional law addressing such placements has primarily addressed situations in which a removal order has been made respecting the custodial parent, and has interpreted section 361.2 to require removal of custody from the custodial parent prior to placement of the child with the noncustodial parent and many situations involve placement with a noncustodial parent where the children never

23

previously resided with that the noncustodial parent. (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 970; see also, *In re I.A.* (2011) 201 Cal.App.4th 1484, 1494.)

It is also important to note that section 361.2 authorizes placements with noncustodial parents without regard for their status as offending or nonoffending parents. Under that section, a juvenile court may order placement with a noncustodial parent even after a jurisdictional finding has been made respecting the noncustodial parent. The placement may or may not be accompanied by an award of custody. (See *In re Christopher M.* (2014) 228 Cal.App.4th 1310, 1317.) However, in this case it cannot be said that father was noncustodial because he shared physical custody of the children with mother. While a placement under section 361.2 is possible for a parent in this situation, the statute contemplates a removal of custody from the custodial parent with whom the children were residing at the time of the Department's intervention, and the requisite findings to support a removal.

Where a custodial parent is a nonoffending parent, there are other options. On the one hand, where a court does not find that placement with a noncustodial parent would be detrimental, the court *shall* place the child with that parent. No jurisdictional findings were sustained as to father, so he was also a nonoffending parent, as to whom no detriment finding could be made by clear and convincing evidence, within the meaning of section 361, subdivision (c). Without any jurisdictional findings attributable to father's conduct and no grounds for a detriment finding that would warrant a limitation on his custody rights, he was entitled to placement of the children as well as an award of

24

custody. "As used in section 300 proceedings, the term 'placement' connotes where the child shall live during his or her dependency."[7] (*In re V.F.* (2007) 157 Cal.App.4th 962, 970, citing *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1131; see §§ 361.21, 361.3, 361.4, 362.2, 362.7.) An award of custody is not necessarily a placement. (*In re Austin P., supra,* p. 1131.) This means that if there are no grounds for court supervision, an award of custody is the appropriate order. As the court explained, "In section 361.2, subdivision (a), the Legislature used the term 'custody' when describing what the nonoffending noncustodial parent seeks, but used the words 'place' and 'placement' when describing what the court should do if it determines there would be no detriment to the child. We presume the Legislature intended the word 'custody' to have a different meaning from the words 'place' and 'placement.'" (*In re Austin P., supra,* 118 Cal.App.4th at p. 1130.) Depending on whether there is a basis to find detriment, the court may consider allowing the nonoffending parent to retain custody, without removal of the child and placement.

---

[7] "Rule 1428 [now rule 5.616] includes in its definition of 'placement' (1) an award of custody to an out-of-state parent where 'the sending court retains dependency jurisdiction over the child or . . . requests or provides for supervision or other services or places some other condition or restriction on the conduct of the parent' (rule 1428(b)(1)) and (2) an order sending a child out of state without a specific return date, with a return date more than 30 days later, or with a return date after the end of a school vacation, unless 'jurisdiction has been terminated or . . . dependency is maintained only to provide services to, or [impose conditions on] the noncustodial parent remaining in the sending jurisdiction.' (*Ibid.*) Rule 1428(g) states, 'If a child is placed in another jurisdiction under the terms of the [ICPC], the sending court shall not terminate its jurisdiction until the child is adopted, reaches majority, or is emancipated, or the dependency is terminated with the concurrence of the receiving state authority.'" (*In re John M.* (2006) 141 Cal.App.4th 1564, 1575.)

In *Miguel C.,* mother had argued it was error to remove custody from her in order to effectuate a placement with the noncustodial parent, arguing in part that section 361, subdivision (c)(1), did not authorize removal unless the court finds there are no reasonable means to protect the minor, such as by "[a]llowing a nonoffending parent, guardian, or Indian custodian to retain physical custody as long as that parent, guardian, or Indian custodian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm. (§ 361, subd. (c)(1)(B).)" (*Miguel C.,* 198 Cal.App.4th at p. 970.)

However, in that case, the noncustodial father never had physical custody at any point relevant to the proceedings, so there was no custody to "retain," resulting in the conclusion that the provision of section 361, subdivision (c)(1)(A) did not apply. (*Miguel C., supra,* 198 Cal.App.4th at p. 970.) The logical corollary of this rule is that where the children have resided with the nonoffending parent at some point before intervention by the Department, an award of custody to the nonoffending parent can retain custody, eliminating the need for removal.

The present case is therefore distinguishable from the situation in *Miguel C.,* insofar as father had been the custodial parent until mother left him, taking the children to California to pick up G.A. shortly before the inception of the dependency, and there were no Family Law orders granting physical custody to mother. Father was deemed the presumed father of all three children because he had exercised care and custody of all three children when the family lived in Reno, Nevada. Although the relevant court rule

26

(Cal. Rules of Ct. rule 5.695(a)(7)) restates the interpretation of section 361.2 propounded by *Miguel C.,* that rule, and the decisions following *Miguel C.*, presuppose that the noncustodial parent had no custody to retain within the meaning of section 361, subdivision (c).  (See, *In re I.A., supra,* 201 Cal.App.4th at p. 1494, where the reviewing court relied on *Miguel C.* in holding, "Because the minor never resided with Father, however, he was ineligible for custody under subdivision (c)(1) even if nonoffending.")

Here, while the children were not living with father at the time of the events that led to the Department's intervention, all three minors had resided with him prior to mother's move to Riverside County, some months before the initiation of the dependency, and had taken G.A. into his home when mother dropped him off in November 2020, prior to the detention of the children.  Thus, the court could properly apply section 361, subdivision (c)(1)(B), finding that father was not residing with the children at the time of the events or conditions that arose that brought the children with section 300.  Because the court struck the allegation that father failed to protect the children, he was properly considered a nonoffending parent.  At that point, father was eligible for placement within the meaning of section 361, subdivision (c)(1)(B), due to his joint legal and physical custody of the children prior to mother's move to California, where she blocked father's contact with the children.  But the court did not make the appropriate findings for such a placement.

Respecting placement pursuant to section 361.2, the court did not make findings pursuant to section 361, subdivision (c), and did not actually remove the child from

27

mother's custody.  While removal would not be required for placement under section 361, subdivision (c)(1)(B), it is contemplated for placement with a noncustodial parent under section 361.2.

Neither party has addressed these principles.  Mother asserts that the lack of section 361, subdivision (c) findings and a removal order renders the disposition void, while the Department argues the lack of express findings is not prejudicial because the findings can be implied.  We conclude the orders are not void but are unaccompanied by the relevant predicate findings.  And we are reluctant to imply findings which implicate custodial rights, and conclude the proper remedy is to remand the matter to the trial court for appropriate findings.

If the court intended to place the children with father pursuant to Section 361.2, the court should make findings pursuant to section 361, subdivision (c) and order the removal of custody from the mother and award custody to  the noncustodial father.

If the court intended to award custody to father without removing custody from mother, the court needs to make specific findings pursuant to section 361, subdivision (c)(1)(B) and order placement with the nonoffending parent.  In other words, while we agree that placement with the father is the appropriate disposition, the trial court must make the appropriate findings to support its choice of placement options. For this reason, we remand the matter to the juvenile court for appropriate findings.

### DISPOSITION

The judgment is reversed and remanded for further disposition proceedings in which the juvenile court is directed to determine whether the child is to be placed with father pursuant to section 361.2, in which case the court shall make appropriate findings pursuant to section 361, subdivision (c)(1)(A) and remove custody from the mother, or whether the child is to be placed with the nonoffending father pursuant to section 361, subdivision (c)(1)(B), without findings of detriment or removal of custody from mother. In all other respects the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

MILLER
J.

SLOUGH
J.